All right. Thank you. And let's call our first case, Covertech. Our only case this afternoon, Covertech v. TVM Building Products, Inc., etal. Mr. Baggett. Good afternoon, guys. Michael Baggett on behalf of the appellant, TVM Building Products. Appreciate the opportunity to appear before you today. Before we go any further, let me just ask a real quick question, if I could, of Judge Van Aske. Can you hear us all right? I hear you loud and clear. Can you hear me all right? Yes. Okay. Thank you. Please proceed. Your Honor, I'd like to reserve three minutes. Done. Thank you. You know, this is an appeal, TVM's appeal, from a finding of the district court of a trademark infringement by TVM on the Covertech trademarks. And we're well and truly familiar with the record and the briefs, So maybe we could just jump into this with what to me seems to be maybe the most significant question. Folks were asked to provide supplemental submissions about the tests and so forth for manufacturer distributors. And we received that from both sides. From TVM's perspective, there was nary a word about the presumption, which is set forth in that test and D-blurs modeled on the McCarthy Treatise. And I'm just wondering, do you have a response? Yes. I mean, assuming that test applies, it says there's a presumption that the manufacturer owns the mark. I take it that that means the burden is on you to show that the manufacturer doesn't own the mark. But I didn't see any argument in that regard. Your Honor, we jumped right into the criteria, and that's correct, that we have to rebut. The issue relative is whether there's a contractual relationship or the expectation of contractual relationship. There was none here in terms of the exclusivity agreement. Where the ownership issue is principled to and really impacts TVM is on the issue of the fraud, Your Honor. I'm not sure I'm following that. Here's the point I'm trying to get you to respond to if I could. Let's assume for the sake of discussion. Well, let's not assume anything. If it were the case that outside the context of the manufacturer-distributor relationship, that CoverTech had actually established rights in the mark, the Ultra NT mark. I guess I should be specific. That's the Ultra NT radiant barrier mark. The fact that TVM later said, no, we're using it too, that couldn't dislodge the preexisting rights of CoverTech, right? That is correct, Your Honor, however. Okay, so just stick with me on the hypothetical for a minute. I recognize you don't agree with that factual premise. But let's assume that if we change that and say, well, it's not clear that there was any ownership established outside the context of the distributor-manufacturer relationship. Then is it your position that the Deibert test is the right test to apply? It would be our position, Your Honor. We've addressed both positions, the first use and the Deibert position. But in terms of the consumer expectations, we would address that. The first criteria would be who created the mark. Well, if that's the right test and the thing you start with is a presumption against you, have you made any argument? Do you have any argument that overcomes that presumption? Other than the consumer test, Your Honor, that we've set forth in our papers, which is the first criteria, the sixth criteria of the Deibert test, meaning who, in fact, created the mark. Is it your position that the Deibert test and McCarthy factors are what apply? I understand in your supplemental submission you've tried to address those factors. But we also asked you in our directive for supplemental briefing to address the question of what the appropriate disposition would be if we were to conclude that the wrong framework had been applied in the district court. Right. That also was not addressed by TVM.  Your Honor, I felt that in respect to that we had addressed that, that under that criteria that the position would be, it would be a TVM mark based upon the entity that created the mark, its use. Let me clarify the question, which is really should this court, in the first instance, be applying that test, or if we conclude that the district court used, erroneously used it, the first use test, is remand required? That's what we would submit, Your Honor, that it should be remanded to the district court for findings relative to the Deibert test. Now, excuse me, in Deibert we said that we conclude that this approach, the six-factor approach, is inapplicable in cases where initial ownership has already been established. And doesn't the district court's resolution of the first use of the trademark establish ownership? Well, I think what the district court did by arguing first use, that jumps over the Deibert test. I mean, if we're using it as an alternative, the first use test. That's right. That's right. In Deibert, as a matter of fact, the court did not apply the six-factor test. It did it as a backup, but it said that first use was by the grandfather and the father using the Deibert name to sell its corn seed. And so there would be no need. They went on to quote from Seventh Circuit Judge Fischer, quoted the Seventh Circuit decision that says, we're not going to use some amorphous balancing test where ownership has been established. Right. So should we be even looking at the six-factor test? Well, if, in fact, the court provided the wrong test, then yes, we do. We have submitted that the court was incorrect in its first use. I guess the question I have of you is when should we look to the six-factor test? Do we do it in every instance where there's a dispute between a manufacturer and a distributor or only when there is some uncertainty as to first use? Well, I think that would be as to the uncertainty. Not every case. I think McCarthy's treatise indicated that there are times when the ownership is evident from the inception. In this case, it is not. The TVM has been involved with CoverTech since 1998, since the beginning of the whole process. And that's where the issue comes in is who is the owner, whether or not it is TVM or CoverTech, and that's where we get into the Deibert test because there is no specific first ownership nor is there contractual relationship or definition of who owns the marks. This whole question only deals with the ultra NT radiant barrier mark. That's right, Your Honor. That's all we've really focused on is that question of ownership on the ultra NT radiant barrier mark because that was the one that the testimony indicates that that is the one that was specifically created by TVM. Well, that's a fact question, right? Who created it, et cetera? You lost on that. Step back. Is ownership a question of fact or law or a conclusion of law based on underlying findings of fact? How would you characterize it? Based on the conclusion of law and based on the underlying findings of fact. Okay. And one of the underlying facts would be who created it, right? Right. And the district court judge made a specific finding on that, said that this was created by CoverTech, right? He did. So how is he clearly erroneous? What's your evidence that he's clearly erroneous? Well, the evidence is he applied the first use test to determine it. The only testimony is John Scott. Now you're talking about law. I'm just saying as a matter of fact, he heard witnesses, he saw evidence, and he said, I conclude that this mark was created by CoverTech based on what I've heard and seen. It was created by CoverTech, and then there was a sale to TVM sometime around 2003. Those are matters of historical fact, right? At least according to me, you don't agree with that. Yes, and that was where we get into the abuse of the discretion. Well, there's no abuse of discretion standard. When we're talking about finding the fact, you have to show that he wasn't just wrong, but he was clearly wrong. He was clearly erroneous based on the evidence when he said CoverTech came up with it, CoverTech first used it when it sold it to TVM. CoverTech actually is the one that the public generally associates in the mind with the mark. What's the evidence you point to to show he's clearly erred in making those decisions, the trial judge? Your Honor, he relies specifically on the testimony of the CoverTech employees, which we do rely on the testimony of the CoverTech employees. You see, he's entitled to do that, right? I mean, that's the whole point of a bench trial. I'm sorry. He is exactly right. He can do that. But the CoverTech employees indicated that TVM first used the mark in Congress in 2001. Mr. Myers, who worked for TVM, now works as a national sales manager for CoverTech, indicated that TVM was using that in 2001, the alternative rating period. When asked, Mr. Ross, who was the president of CoverTech, indicated he didn't know when it was created or how it was created or who created it. Mr. Starr indicated he was the vice president. It was in 2003-2004. So why can't he accept Starr's testimony? If it's all laid out in front of him and he's making credibility determinations, isn't it absolutely the fact finder's privilege to say, I believe this much of what this person says, I believe that much of what that other person says, I believe none of what that guy says, I believe all of what this person says. Because that's the whole point of having a fact finder, right? That is your argument. Okay. So if that's the privilege of the fact finder, do you have anything that you can point to other than saying, well, we think these other people are more believable, that demonstrates clear error in the district court's factual determinations, that is, who came up with the mark, when they first had occasion to employ it, whether it was a public use or not, et cetera? Again, you're right. I think when he gets into the wrong legal analysis in terms of whether or not it was public use, he said that that court found that that one sale to his exclusive distributor in 2003 of a product called Ultra RBF, or, you know, he didn't even have the complete name. He found that that one sale in 2003 was, in fact, a public sale to the public, and it was not into the market, was not in the public. Additionally, it was a de minimis sale. And he also found that there was continuous use, Your Honor, and that's where he said, even Covertech's own testimony indicates that it could not have been continuous use, because Covertech didn't sell into the public until 2007, until after the termination. It was continuous in the sense that it was going out to the public through TVM at that point, right? If you accept the district court's conclusion, it doesn't make any difference whether it was going through TVM or independent of TVM, does it? If it's a sale, TVM is packaging on it, TVM is marketing, TVM is standing behind it, TVM is doing everything, then I think it has some impact if TVM is doing everything. In the context of employers, the only thing we did was manufacture. We didn't do anything but manufacture. We didn't put our names on it. We didn't market. We didn't know who the salespeople were. We didn't know who the customer base was. This was all TVM. So that's where we have an issue with whether or not it was, in fact, continuous. That's not unusual in an exclusive distributorship context. It doesn't give you ownership rights in the manufacturer's trademarks, does it? That may or may not, but I think that's where the first use comes in, that it was not, in fact, that TVM had the first use. Do you have any documentary evidence of a first use that predates the 2003 invoice? No. I'm sorry. The evidence comes from CoverTech's employees who indicated that TVM was selling it prior to CoverTech. Mayor Sastroni, which is what I think you're referring to, actually only talks about the product, the same product number, not about the mark being sold as early as 2000, right? Right. No, I think he says we were selling ultra-empty radiant barriers early when I first came there. That's what we were selling. And he also was involved in the development of the nomenclature with Mr. Boulding when they developed the term ultra because prior to TVM's use of the ultra, that name was not in existence. According to TVM, because of the thickness of the product and there needed to be a lighter product in the market, TVM came up with the ultra. So that's where the name came from. Let me ask you in response to a prior question. You indicated that you thought remand was warranted so that the district courts make additional findings. If this case was remanded, is there other evidence that TVM would put into the record that's relevant to McCarthy factors? No, I guess the only evidence would be earlier invoices that we did not put in a factor in terms of earlier sales in marketing materials. And what- In terms of who created it. In terms of the McCarthy and the Dover factors, I think it's pretty clear that both parties did the advertising, that both parties stood behind the product at some point. So there's no additional evidence that TVM would put in on remand relevant to- I don't think there's probably much that we had out of them. I think Mr. Myers indicated that TVM and the offeror were synonymous, meaning in the eyes of the public that they looked to TVM for that brand, that product. Can we step back to the threshold issue that we also asked you to address with supplementary briefing, and that is the issue of mootness that was raised by CoverTech. Your response to that was only the TVM's assets were sold after the cancellation of the mark, so it couldn't have been transferred. But don't we need to think in terms of the actual terms of the sale, not the timing of the sale? That is, what do the sales documents reflect about who owns the claim to the mark, the show and action that was on appeal at that time? Well, the sale documents, from my recollection, it was an Article 9 sale, and everything went, lock, stock and barrel, accounts, intellectual property, everything was sold to my tax. What, if any, provision was made for pending litigation? I was not involved in the sale. I could not truthfully and honestly answer that question. There was, in fact, a provision made for that. You seem to indicate in your papers that the letter that you provided in response to the request for the response, that you believed the existence of the judgment against your client in itself, that is, that judgment of liability for fraud on the PTO, constituted a continuing basis for standing, if I understood you right. Can you explain that a little further? Why is that going to be enough, the fact that there is an outstanding judgment against your client on that claim? Well, one of the issues on the fraud claim was whether or not Mr. Boulding committed fraud by indicating that he believed that TVM was the owner of the mark. The key factor of that is his belief that they were owner. Now, if it were determined, or at least there's some question that TVM did own it, obviously there's no fraud on the patent trademark office. And that is the real issue in terms of TVM's concern on appeal, is the issue of the fraud and the finding that it was a deliberate fraud. Is there anything in the damages award or anything else that captures or, in some fashion, depends upon that conclusion by the court of fraud on the PTO? In terms of the damages, the monetary damages, no, Your Honor, there's not. If that's true, what is the continuing interest that you have? The fact that there is a judgment, even if it's not reduced to some... I mean, what's the injury that you can point to? Well, the injury to TVM, Your Honor, is the injury in the marketplace. The reputational injury? The reputational injury is Covetech goes out and says, hey, TVM committed fraud upon the patent trademark office, and that's simply not true based upon the standard, on the higher standard. In those, that's not the case. I think the judge applied a negligence standard here. Mr. Boulding clearly indicated that. I didn't read this. I should have read this, and that's what the judge said. He said, well, he should have read it, and he should have known better, and he should have taken more time. Is there some collateral consequence to TVM or Mr. Boulding, separate and apart from cancellation of the mark? I think there is collateral consequence in the marketplace, Your Honor, because Mr. Boulding was president of the Reflective Insulation Manufacturers Association, so he does have a reputation in the market, and the finding that he committed fraud on the patent and trademark office is very damaging to him personally and to, obviously, TVM, to the extent that TVM still exists. It's more damaging to Mr. Boulding himself. Mr. Boulding is not a party to this case, is he? He is not, Your Honor, but the court found that Mr. Boulding was the one that committed the fraud by signing that statement. Sure, but doesn't TVM or a successor in interest to TVM, somebody that you just said, to the extent it still exists, who's got an injury that's – I'm prepared to accept for the sake of discussion that a reputational injury is a real injury, but who's got a reputational injury who's still in this case? TVM is still out there, Your Honor, and Boulding is associated with TVM. How is TVM still out there if it's all been sold? Well, the name is still out there, Your Honor. You're correct. I mean, the name is still out there. Boulding's still in the marketplace. People do associate TVM with Boulding. They associate the fraud. There's no doubt about that. Excuse me. I thought the district judge made an award of damages for the infringement of the ultra-radiant NT mark, ultra-NT radiant mark. Isn't that simply enough to keep this controversy alive, or am I wrong? Did he not award damages? He did award damages, Your Honor, based upon the ownership and the mark. Were liabilities transferred to MITEX as well? No. As I understand it, under the Texas, they have a safe harbor law in terms of Article IX sales. Texas does not allow successorship liability, as I understand what I've been told, Your Honor. So who's around to make good on, if a four-plus-million-dollar verdict were upheld, what pocket is it coming out of? Is there a TVM in existence with assets? No. Frankly, there's no physical assets in TVM, Your Honor, at this point. Was an appeal bond filed? No. No. There's no appeal bond. No. Mr. Bolden is also a principal of MITEX. He is. And do you represent in any capacity Mr. Bolden or MITEX? I do not represent MITEX. I can't say I represent Mr. Bolden individually, other than dealing with him as the principal of TVM. That's correct. But he is involved. He has some interest in MITEX, I believe. Does the entity TVM Building Products, Inc. still exist? Yes, it does, Your Honor. It does. All right. And does the entity, there was on our case caption here, TVM Canada, Inc., as well. Is that a party and does it exist? TVM Canada, I believe, still exists, but it was dismissed from this litigation early on, so it really had no party or association. That was an agreement when they got rid of the dilution claim and the fraudulent misrepresentation claim. TVM Canada went away, too. Yeah, and there was just no jurisdiction over TVM Canada here, too, but it went away. I think it was transferred to the Middle District to the Western District. At that period of time, we agreed that TVM Canada would be eliminated from this case. All right. Any other questions, Mr. Krause? Just clarifying a couple things. You raised the defense of latches as well as acquiescence. CoverTech in its response in brief points out that that appears to have been waived, and we don't have a reply with your response. Do you concede that latches was not waived and that was waived? I'll concede that, Your Honor, that latches was not waived. But as to acquiescence, I think the court indicated that there was no acquiescence in terms of an affirmative deed or an implied consent. Our position is that there was implied consent because in 2007, CoverTech claimed that it knew that TVM was selling product, that it was manufactured by Reflectix and eventually Suprema, but using the CoverTech names and numbers. CoverTech continued to sell to TVM to 2010 when it knew, according to CoverTech's own testimony, it knew that we were using the same names, same numbers, which we were using the same numbers, same names, and at that time it was being used that the Reflectix and the Suprema products were being rated the same. There's no differential between the three, actually, at the time because it was all TVM private label, but they continued to sell to us. Is it your position that merely continuing to sell is an affirmative act or deed that is communicating consent? Well, in terms of, because it went on even after that. In 2010, when they discovered that TVM had purchased about $8.8 million from Suprema and $2.9 million from Reflectix, still they did not ever at any point in time issue any statement or object to TVM's continued use of the names and the numbers. But the record reflects that there were multiple verbal objections, right? Well, that's what the record reflects. That's correct. Well, that's what the record reflects. Isn't that what we live with? I mean, the district court, again, made findings and said that, in not so many words, you were never authorized, there was never authorization to do the things that TVM was doing after the termination of the agreement. That the continued use and certainly the false marking of other people's goods with CoverTech marks was never agreed to. Those are holdings and, indeed, factual findings of the district court. Where's the clear error? Well, the district court, what it did not consider, Your Honor, was the affirmative act of the continued sale and the failure to object or to do anything up until 2013 when it found, when it finally actually did something and filed this complaint. Mr. Araujo has indicated we didn't do anything. In spite of our knowledge, we let them continue. And that, I think, would be the acquiescence in terms of an affirmative act, allowing them to continue in the face that you knew. And supposedly, you're being damaged by tens of millions of dollars, yet there's no e-mail, no fax, no written. I thought the district court had actually said, I thought that the testimony was, we did not know that they were marking other people's goods. We didn't understand that. We were under the impression that they had mistakenly continued to use our mark on some goods, but not that they were marking other people's products with our marks. Am I mistaken about that? I think you are, Your Honor. It goes back to even the court said, Your Honor, in 2007 when they terminated exclusivity, the court said that the second reason, one of the reasons was, the first reason was they lost money. And the second reason was they terminated it because they found out that TDM was selling Reflectix products using the same numbers and the same names as the CoverTech product. That came to light for the district court's findings in some isolated instances. And the district court also found that it wasn't until 2010 that the scale, the extent of infringement became known to CoverTech. Again, aren't we reviewing for clear error those findings? Well, that's what the court did, but it also ignored the testimony of the other CoverTech employees, too. Mr. Myers, who indicated that he used to work for TDM, and he went, I think it was in 2008 when he was with CoverTech, he went to Oklahoma and he found an instance of it. Mr. Clark, who worked for CoverTech, also worked for TDM, indicated that in 2007 Mr. Bolden told them, this is what he said, Mr. Bolden told them that they were mislabeling products. So it just wasn't an isolated instance, but you are correct, Your Honor, that in 2010 in this newer deposition is when they found out, according to them, that they found out of the volume. But what did they do when they found out it was so bad and so dangerous? He said if we'd known earlier, we would have terminated and done something. Well, he knew in 2010, and still they did not do anything until 2010. They stopped selling to TDM, didn't they? They did stop selling, Your Honor, in 2010. But interestingly, at that point there was no agreement as to who owned the marks, who owned the numbers, and there was no communication. TDM stopped doing what you're doing. That would have been an opportune time. According to them, they were buying tens of millions of dollars and the sales had gone up. But they still never told them to stop. And that's where you get into the fraud issue. So you think that's an obligation on the part of the holder of the mark, that they've got to tell you to stop, and if they don't, they're acquiescing. Well, see, that's where we get into the factual issue of the holder of the mark. TDM believed that it was the holder of the mark because it had... Only one of the marks, only one of the marks. You know, that's why I wanted to stay away, because you're not contesting the findings. You've got an incontestable mark with respect to the RFOIL, and you have an incontestable mark with respect to Concrete Barrier. They're not at issue here. The only one we're talking about is the Ultra NT. They are not at issue, Your Honor, and that's interesting you brought that up, because there's no evidence anywhere on the record, or even attempted by KyberTech, that TDM ever sold any RFOIL product or Concrete Barrier product after the exclusivity period. They simply did not. There was no evidence that they ever did. Now, there were some advertising on a third-party website that the court found that TDM had control over, even though it was a third party. But there were no sales of either of those products by TDM in any of that period of time after the exclusivity expired, and I think TDM admitted we had no right to sell RFOIL. The website is tdmbuildingsupply.com? Yeah, that's right. That was tdmbuildingsupply.com, Your Honor, which was a third party, not the TDMI, which is TDM's website. With regard to damages, do I understand correctly that your arguments on appeal are limited to RFOIL and Concrete Barrier? I think that's what the damage is. I mean, that's where the court assessed the damages. Well, the court assessed the damage on the reflective insulation industry, the entire metal buildings market. That's a calculation. But as to your claim that the district court abused its discretion, you referenced RFOIL, Concrete Barrier, and the $4.05 million award. I just want to be clear that that's the only area your contending was made on appeal. To the extent that damages were entered on other marks, that's not something that you've argued on appeal? Well, we haven't, Your Honor, because it doesn't appear that they were entered on other marks. Other than, and I back up a little bit, that there was a $186,000 award on the ultra-concrete, ultra-empty radiant barrier mark that we are. That's correct. And as to the error that you are alleging with RFOIL and Concrete Barrier, we have already said in our Banjo Buddies case that the onus is on the defendant to counter a plaintiff's evidence of sales. We are here. I understand your objection that this was overall sales to the industry. But isn't the information about costs or damages, the deductions that would get to a closer approximation of actual profits, within the purview of TVM? And when you didn't put forward anything except the general and uncorroborated testimony, Mr. Boulding, on that score, why was it an abuse of discretion for the district court to undertake the calculation it did? Your Honor, we understand that the record is pretty void of any TVM evidence as to the contract to represent other than Mr. Boulding's testimony that was 30%. The only issue is that the court just used the metal building industries as a whole when the only sales that are indicated would have been reflective installation products were not subject to the infringement claims. You don't dispute it. The district court did calculate in the alternative the statutory damages. We don't dispute that, Your Honor. So is what we're really talking about here a delta of $50,000? In terms of? Well, if the statutory damages and the actual damage numbers are apart by $50,000, it's only $50,000. Well, I understand the position. And I frankly became pretty weak on that argument, speaking of damages, Your Honor. Okay. My position on the damages would be if the acquiescence argument would prevail, that there should be no damages whatsoever. Although our names are brought, but the acquiescence in itself would prevent cover tax from receiving any damages whatsoever, any monetary damages whatsoever. Mm-hmm. Judge Van Asken, anything else? Nothing else. Thank you. Ross? No. Thank you. Okay. Thank you, Mr. Barry. Thank you, Your Honor. We'll have you back on rebuttal, Mr. Schaffer. Good afternoon, Your Honors. May it please the Court. I'm Brian Schaffer on behalf of the Applee Cover Tax Advocating Incorporated. And I'm happy to address any questions the Court has. Let's start right off the bat with the ownership issue. In your supplemental letter, you vigorously defend the Court using the first-use test. But the Court, what you cite in that regard is from JA69, if I recall correctly, which is in the Court's conclusions of law. And the Court said cover tax sold the mark, and I assume that the Court meant sold goods bearing the mark as early as 2003, and has been selling it, and, again, I assume that it means goods bearing the mark, in interstate commerce since then. Initially, the sale was made to TVMS Cover Tax Exclusive Distributor. However, the Court finds the sale since 2003 to have been sufficiently public to want to find the cover that could have sold the product in interstate commerce since 2003. So I look at that, and the question that comes to my mind is, to the extent there's a finding of fact, a historical fact embedded in there, it looks like the finding is that the first sale was a sale of a good bearing the ultra-anti-radiant barrier mark to TVM as Cover Tax Exclusive Distributor. And the question I've got for you is, how can that qualify as a first sale for purposes of establishing ownership? Your Honor, two points on that. First of all, there's a factual finding by the District Court in addition to JA69 that you cited, which is the ownership point at page 11. I'm reading page 11 and page 8, and they don't talk about, unless I missed it, they don't talk about any dates there. Page 8 talks about Cover Tech developed and used the ultra-anti- excuse me, page 11 says Cover Tech developed and used the ultra-anti-barrier mark. It doesn't say when it did it. Cover Tech never gave permission is what it says on the next page to TVM to use that mark. Where are you relying on? Because I might have just missed it. I believe, Your Honor, that the District Court found Cover Tech was the first party to use the ultra-anti-mark in U.S. commerce, and you're correct that the basis- They did it, but this is where it said it. Initially, I take that to mean the first sale was made to TVM as Cover Tax Exclusive Distributor, and then the only thing said after that is they kept selling it from 2003. But, of course, that was during the exclusive distributorship period, right? That's correct. So the natural conclusion is any sales were going through TVM, right? Not directly through the public. That's correct, and, Your Honor, under the first use test, we believe that having established that the mark first came from Cover Tech to TVM, so as the first use, and then the continuous use of that mark- We're missing, I'm sorry, Mr. Schaefer, I'm not being clear. I understand the law to be that first use in a trademark sense, establishing ownership, is sales to the public, some bona fide, significant sale to the public. By definition, an internal sale to an exclusive distributor is not such a sale. Isn't that right, just as a matter of law? I don't know that that's the case, Your Honor, that a sale from a manufacturer to a distributor through U.S. Commerce could not be considered sufficiently public. Is there some authority you can point us to? Because there's certainly none in your supplemental brief that suggests that that is the law, that that could constitute first use, the sale to a distributor, rather than into the marketplace of the public. Your Honor, I think if the question is in looking at first use and figuring out whether the public will identify the mark with the manufacturer, the fact that it is distributed through a distributor, even an exclusive distributor, does not preclude a finding that the sales are sufficiently public. That consumer education approach gets to the debunk factors. We're talking about whether you've defended the application of the first use test. What is your authority for the proposition that an initial sale of a manufacturer to a distributor with no evidence of prior sales to the public in that market constitutes a first use? Your Honor, I don't know if I have a case that's actually on all fours with that, the Ford Motor Company. The one that's on all threes? Do you have something close? Because I'm doubting there is something. I think the law is you've got to sell to the public, and the court's statement here is you sold to TVM, and that's where the sales were going. I guess that leads naturally to the next question. If the first sale doctrine doesn't get you ownership, aren't you perforce into the Bieber test for manufacturer-distributor ownership disputes? If this court concludes that a first use test requires sales to the public and that a sale, including a first sale and continuous sales through a distributor in the United States, would not ever satisfy the first use test, then we would be beyond that to the next question, which is, is there a contractual assignment of the mark? Which everybody seems to agree there isn't. Correct. And that we would then be into the next question, which is, in the absence of a determination of first use and ownership through first and continuous use, we would be into, as the court in Diebler described, a situation where it would be appropriate to try to figure out if the consumer expectation would in fact divest the manufacturer of the mark. Divest, right? We're not talking about divestment. We're talking about ownership in the first instance. You don't even get into that six-factor test unless the question is who owns it. Diebler is pretty clear about saying we don't apply these six factors to divest people of anything. If their ownership exists, it exists. But the thing we're trying to get you to come to grips with, and which you seem to step over in your supplemental submission to us, was that I'm not seeing on the record, and I'm not hearing you give me something on the record, that shows the district court made a finding of fact that outside the context of the distributor relationship, any sales were made. Everything that was done was done within the context of the exclusive distributor relationship when it comes to the Ultra Energy Radiant Barrier brand, at least. Am I right about that, about the record? You are correct about the record, Your Honor, was that the district court concluded that the sales to TVM through the exclusive distributor relationship were first by CoverTech, were continuous, and were sufficient to satisfy the first use test. If this court concludes that that is not the law of the Third Circuit, and we don't have an assignment and a contract, then we are to the next question, the consumer expectation. When I said divestment, I misspoke. What I really mean is there's the presumption that exists at that point of the manufacturer. The presumption. I apologize. That's what I meant was, okay, you start with that presumption, then you have the six factors that McCarthy lays out and Diebler's applied in the second instance in that case. And what supports, once we assume that we got to that point, would we need to say, hey, send this back to the district court to do findings on this? You seem to indicate that that's something you think would be okay. Do we need to do that, or does the presumption on its own carry the day for you? I believe, Your Honor, that the way that the test and the consumer expectation in this issue would be applied is that it would be the burden of TVM to upset the presumption. So if either the court looks at the record, and in our submission, we cited the findings of fact by the district court, and because of the issues in the case, there were findings of fact that were made on each of the six factors that goes into the Diebler consumer expectation test. And so from our perspective, again, if the court concludes that it would be appropriate and that ownership needs to look at those six factors, we believe the record of the district court on appeal provides you with factual findings on each of those, and that unless TVM has come forth with a basis, essentially to carry a burden different than what has been established with the presumption, that you could affirm on that alternative ground, which is based on the factual record and factual findings of the district court, applying the consumer expectation in DSHA, CoverTech, as the manufacturer, has ownership of the Ultra-NP radiant barrier mark. Let me ask you about some of those specific factors and some of the things in the record that Mr. Bankett identified. Specifically, as to which party's name appears on the packaging and promotional material, what, if any, significance is there that TVM's name and logo is more conspicuous and larger than CoverTech, even where CoverTech's name also appears? Your Honor, I don't know that there was any factual finding that the TVM's reference on the materials was more prominent. I think the factual findings and the evidence was that CoverTech's name as the manufacturer of the product was consistently and always reflected on the marketing and on the product itself. But as you pointed out, we're not limited. Even if we look at this, apply the deeper test in the first instance on appeal, while we may have findings that we can rely on, we also have a record that we can rely on. And the record here reflects, as I said, that where their names are both appearing, that TVM's logo generally seems to appear more prominently. Is there any significance to that for the third factor? Your Honor, I don't believe so in this instance, especially where you look at the relationship between the parties and the relationship with the public, and that is who stands behind the product, where does the warranty come from, who is responsible for manufacturing, design, and submitting the mark of the product. So the who stands behind the product, the fifth factor, what do we make of the significant frontline role that TVM plays in terms of fielding the complaints and interfacing with the public? McCarthy, in describing, expounding on what that factor is, specifically gives the example of which party received complaints for defects and made appropriate replacement or refund. That was TVM's role as the exclusive distributor, right? Your Honor, they may have been the recipient in the first instance of the complaint. They were not the ones making repairs or refunds. They repeatedly referred those to CoverTech for responsibility. And I think in every instance where you have an exclusive distributor relationship, and especially one with a Canadian manufacturer and a U.S. distributor, there is necessarily going to be a role for the distributor in interfacing with the public, but the fact that that is occurring, at least based on the record and the evidence in this case, it was not so overwhelming, not so all-inclusive, not so displacing to effectively have the public look at, and that's really I think what consumer expectation and dish are getting at, is are the public going to associate this mark more with TVM than they are with CoverTech? And the testimony from the customer at the trial, Dan Higgins, was unequivocally that he as a purchaser, he in the industry, looks to CoverTech. How about the sixth factor? You make the argument that even though TVM made all the direct payments for advertising and promotion, that that factor tips in CoverTech's favor because it gave discounts to its exclusive distributor. Is there any case law or authority to support the proposition that that kind of indirect payment, to use generously, would satisfy this factor? I'm not aware of that arrangement being discussed in a case applying the sixth factor test. What I will say is that at the trial, there was a significant series of questions to numerous witnesses about who paid for advertising, who was responsible for advertising of the product, and the record from the CoverTech witnesses, which was credited by the trial judge, was we were involved in that process. They ran it by us. We had to approve it. If we did not approve it, they would have to change it. And how would they compensate? That's content, not payment. There's no dispute that the actual direct payments were made by TVM for advertising and promotion, right? Your Honor, I believe that's correct. I have not reviewed the record to confirm whether there was testimony from CoverTech that had they been paying for the advertising services, that the cost charged to TVM would have been higher. But apropos your earlier point about certain attributes that are inherent in the manufacturer-distributor relationship, if we were to say that providing a discount, manufacturer providing a discount to its distributor, constituted payment for the distributor's advertising costs, wouldn't that render this factor meaningless? And then every manufacturer-distributor relationship, presumably, whether it's because it's in bulk or it's an exclusive relationship, is going to involve a discount. I'm going to judge Krauss on that point, which is the mere existence of a discount doesn't help me on that sixth factor. I believe that the discount was provided in a manner such that there was compensation provided to TVM because it was doing the advertising. So in a situation where there was a separate budget for advertising, for example, or there was a set amount that was going to be agreed to as a discount for bulk purchases, no indication whatsoever that it is compensation for the advertising role, then I think on the sixth factor there wouldn't be any legitimate argument on the manufacturer side. Here, where I think we are is that we believe because the compensation through the discount expressly contemplated that they would be paying for doing the advertising, that that does, in fact, flow from us. And at worst, it's a neutral factor because, again, they did do the advertising. When you say expressly contemplated, what specifically are you thinking of in the record? I believe that Mr. Starr was asked the question about the arrangement with TVM and whether TVM was paid a fee or was paid an amount to perform any of its distribution services. They were not, and I believe the testimony was that the price at which CoverTech sold their products to TVM was to compensate them for those services. And so in this instance, I believe in the record of Mr. Starr, there is support for, as we articulate, that the advertising funding comes from us. Do you agree that you folks have the burden of proof when it comes to the damages? We do under an abuse of discretion standard. So we've certainly seen the argument from your opponent that it's inadequate to simply cite sales numbers to an entire industry as opposed to giving some indication of products that actually infringe, that it's inadequate to say 30% is a number to take off the top. I need you to address both those features, okay? Take the first one first. How is it, even with an abuse of discretion standard, sufficient to say, I know you sold products into an industry in this amount over a period of years with no indication of what products were sold? This is outside, I should point out, the record reflects this is, for much of that period, outside the context of the exclusive distributorship period, right? So we know they're selling products from other manufacturers. How is it adequate for the court to say, yeah, you sold a bunch of stuff to the metal building industry. It's all damages? Sure, Judge Shorten. Let me start with sort of the basic premise that the court is just trying under the Lanham Act there to determine the profits occurred through the misuse, the infringement of the marks. Right. And so the marks that were at play for purposes of those damages were R foil and concrete barrier. And R foil and concrete barrier were uncontestable. R foil was repeatedly described throughout the trial by witnesses from TBN, from Mr. Golding, as the overarching umbrella brand for these products. There was not a product that went out without an R foil mark. I'm with you on all that. So you've got evidence that they had done some false marking in that period. Is it your position that because we have evidence that there was false marking, the court was entitled to assume that everything that this company, TBM, sold into that particular market segment was, in fact, a falsely marked damaging thing? I don't think the record reflects that that is what the district court did. The district court could have looked at sales to any market, metal building industry, nonmetal buildings, farm buildings, residential. Indeed. That's what you're getting right at the point I'm getting at, which is I don't understand how this is tied to, I need you to help me understand how is this tied to a reasonable, rational estimation of the damages actually flowing from the infringing behavior. It's just, hey, here's a market segment, metal buildings. Everything happened to do with that, knock 30% off. That's good. Help me understand how that works. I think the challenge that was presented both for CoverTech and the district court was that this information is in the possession of TBM in terms of all their sales of particular products You could ask for information, and if they were cooperating in discovery, you could demonstrate that there's a problem with their behavior. We are entitled to have presumptions in our favor against them. I don't see any of that in this record. Is it in there? I'm just missing it. There was a colloquy with counsel for TBM during the trial with respect to specific customers and their refusal to provide actual sales to particular customers. Let me put it this way. Is there anything in the district court's findings that indicate it is indulging in presumptions against TBM? Because what I read was what I've just kind of loosely described to you. If that's what's going on, how did you carry your burden of proof to reasonably indicate what your damages were? That's fair, Judge. The way we tried to carry our burden, the way I believe we did carry our burden, was through several particular pieces of evidence. Number one, were the sales to the metal building industry during that time period for reflective insulation products and the testimony that R-Foil, the brand mark R-Foil, was used by TBM, regardless of manufacturer, on products sold to the metal building industry during that time. But isn't that some fraction of the products that were being sold to the metal industry? I don't believe there's a record that that's the case, Judge. That's exactly the point. If there's no record, who is that on? If there's no record that R-Foil was the only thing that they were selling to the metal industry, metal building industry, who does that default fall on, you or TBM? We have a burden to reasonably show what the profits were. The testimony profits associated with sales of infringing goods, right? We have a burden to show the sales. Let me be clear on that. We have a burden to show the sales. We don't have a burden to show the profits. Sales of infringing goods, right? Not just all sales, sales of infringing goods. How did you show sales of infringing goods? We did it in a number of ways. One was through the sales to the metal building industry, combined with the testimony regarding products, regardless of manufacturer, sold by TBM to that industry, contained the R-Foil mark, number one. Number two, evidence reflected TBM had purchased $2.2 million of Reflectix product during that time period, $8 million of Suprema product, not CoverTech product, that it went out and sold in the marketplace. So that's $10.2 million of reflective insulation product that went out by TBM. The testimony by MD, we thought we could use the mark. We thought we had the ability to use these marks. We owned them. So the court could have looked at $10.2 million. All right. Then where do we get the 30%? Let's move to the second piece of the question. Where does 30% come from? That's in the court's discretion, Your Honor. The court, I mean, to exercise discretion, it's got to be rooted in something, right? It can't be that he just gets to pick a number. In the record from both sides, from both Mr. Boulding and Mr. Starr, they testify as to the range of markup being 15% to 30% or 10% to 30%. Given that that number is in the record as to profits, how does that become a discount off the top instead of a profit margin? With respect to Mr. Starr, who's our employee, who's never worked for TBM, has no visibility into what TBM's profit margin was, he was asked what he would charge if he was in those shoes, a 30% markup. Mr. Boulding's testimony was, without a document in front of him or the court, 30% is what he chose. He also testified that that was not consistent across all sales. He didn't provide documentation on it. And so the court, looking at the test, with TBM at the burden to show, any valid deductions once we establish sales, says, I don't see a valid, credible basis to assume 30%. I believe the judge was also not looking at it and saying, of course there's going to be some, there could be certainly some cost, some deduction appropriate, but a 70% markup, which is effectively what he looked at, is not out of the bounds of reasonable discretion. Why not? You have to defend that. What is, how does a 70% markup, what piece of evidence in this record supports the notion that there's a 70% margin on these products? You got anything? The two things I would point to, your honor, number one, that there is a clear, significant markup. What is, adjectives aren't helping me. What's clear and significant? You're pointing at a number, any place, that anybody said 70%, or something even remotely like 70%. Your honor, our position is the district court would have been within its discretion to say TBM didn't carry its burden 100% of those sales. That would have been a decision that could have been affirmed on appeal. Also, in light of our precedent in Banjo-Vice, because there we had, you know, as sure as plaintiffs come forward to growth sales, we said that the defendant had not carried its burden, showing what the cost of deductions were, and then we said that the district court properly relied on an alternative method with a calculation of 16% profit. We didn't just say off the top that 100% with some arbitrary number would be sufficient. What authority is there for the selection of a number like 30% or the assumption of a startling 70% profit? Your honor, we would disagree that it's a startling 70% option. We've talked about your own witness thought 30%, so you got more than double what your own experienced industry expert, vice president, thought would have been perhaps what he would have done in the circumstances. I'd say if you get more than like about two and a half times what your own guy says, that starts to startle a little bit. I guess my position, your honor, is TVM had the ability to articulate and defend and show it was 80% or 90%. The profit margin was smaller. That's their burden. That's not my burden. Your burden in the first instance is to demonstrate that you have reasonably demonstrated your damages. You are entitled to an abuse of discretion review when you come to this court. I guess what I'm hearing you say is it would not have been an abuse of discretion for the court to assume that they had a 100% profit margin on everything they sold. That's what I heard you say a minute ago. That's your legal position. You're entitled to rest on that. We're not, your honor, because that's not the factual finding of the judge or the decision. But in terms of the burden shifting, that is TVM's. And, again, with respect to this appeal, because of the statutory damages and our ability to elect the statutory damages, if there was an issue with actual damages with this court or with the analysis that the trial court undertook, we had indicated we would take the higher of the statutory damages or the actual damages. You'd be content with the statutory damages is what I'm hearing you say. If I heard from Mr. Baggett correctly earlier that this was about a $50,000 difference and they hadn't challenged statutory damages, from our position, we certainly believe any issues with respect to the actual damages analysis of the district judge are either de minimis or could be rectified through the election statutory damages. Okay. Judge Faniaski, anything from you, sir? No, sir. Thank you. Okay. Thank you, your honor. Thank you. Judge Baggett, you're above the police. Thank you, your honor. Your honor, I would just point out that Mr. Schaffer indicated that the sales from Supreme were $8.2 and the sales from Reflex were $2.2 million. Those, in fact, were the reflective insulation products, the 2200 series and the 2500 series, nothing to do with the actual infringed upon marks. Secondly, with regard to the deed of the test, I think the first two elements addressed by comfort tax default to the court's finding that in terms of who created it and who affixed the product, they're papers just defaulting to the court's finding. They, in fact, the court made this determination. Therefore, that satisfies this district court's hearing. Doesn't it satisfy it if the court says, not who's got ownership by quote, first use, unquote, but if the court says, I find that this mark was developed by cover tech. They came up with the mark. That's not a legal conclusion. It's just a statement of fact, right? That is a statement of fact. Right. That's one of the findings that the district court made, right? That is correct, and that's where we believe it abuses discretion because there's no evidence to that fact other than the court's statement that they developed it based upon this first use. It seems to tie together, but there's absolutely no evidence on this record that cover tech had any involvement in the development of anything. In fact, the cover tech's own employees admit that the only thing we did was manufacture. We did nothing else but manufacture. We weren't involved in anything else but manufacture of the product. Your Honor, I know it's out of order, but may I address the broad issue? Well, you've got one minute of time. If you go, you can use it how you like. I'd just like to point to the part that you're on with that the application was based upon the belief and the reasonable belief of Mr. Boulding at the time. Mr. Boulding indicated that he did not read the application before it was submitted, and the court said— Wouldn't that be a problem all by itself? I mean, doesn't the application require you to affirm that you've read and understood it? It does. So if he says, I never read it, and he signed something that says I read it, isn't he just acknowledging he's a perjurer? He's acknowledging that it may have been a false statement, but it's not intentional fraud on the court because the reasonable beliefs at the time, given the situation and the circumstances of 2011, he reasonably believed that they had the right to use it based upon his confidence in the trademark office and he believed that they were doing it. In 2011, the district court had not made the finding that you were not the owner, you were not the party to use it. In fact, Professor McCarthy in fact states that. You do not have to go back and you don't have to be a fortune teller when you fill out this application to predict what the court will find years down the road when you make that attestation on your reasonable belief at the time. How are those defenses even consistent? It was negligent. He didn't read it before signing on the one hand, and on the other that he signed it because he believed that the mark had been abandoned. Well, he did believe the mark had been abandoned. According to him, that issue, Ron, the court says there's no indication that that fact is true, that it was all hearsay, and that may be true. However, it's in his mind, his subjective intent, what's in his mind. He believed based upon his communications with the patent trademark office that he had the right to use it. Mr. Starr had called me a year before saying, well, in 2010, we registered it in Canada. Fine. That was Canada. There was nothing else done. These parties, in 2011, they had both been using these marks since 2000, 2001. But his subjective intent goes back to credibility findings by the district court, right? Well, that's right, but the district court used a negligent standard. He should have known, not declared convincing the hilt, but the Bose test. That was the whole issue in the Bose test, too, is that although the court, in that case, set forth the standard, when it actually applied it to the facts, it went back to the negligent standard. It should have known as opposed to the subjective intent and the clear and convincing evidence in his mind. The fact that he said it, and Professor McCarthy did in his treatise indicates that it's almost like a It is very difficult to prove because the line we set forth in the oath indicates it is my belief that I have the right to do that. In 2011, it was certainly reasonable for him to believe that he was the owner based upon the creation of the mark and the first use of the mark. So that was not a reasonable belief. All right. Thank you, Ron. Thank you. We appreciate the arguments. We'll take the matter under advisement. We will call you on another line. OK? Thank you very much. We're in recess.